# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> JUAN CARLOS HERNANDEZ-MORALES, <br><br> Defendant, <br><br> RAFAEL E. CHAVEZ LUJAN, <br><br> Third Party Petitioner. | No. CR13-4061-MWB <br><br> **REPORT AND RECOMMENDATION ON PETITION FOR RETURN OF MONEY** |

## I. INTRODUCTION

This case is before me on a petition (Doc. No. 56) for return of money filed by Rafael E. Chavez Lujan on February 11, 2014. The Honorable Mark W. Bennett, United States District Judge, has referred the petition to me for the filing of a report and recommended disposition.

I conducted an evidentiary hearing on October 15, 2014. Lujan filed a pre-hearing brief (Doc. No. 99) in support of his petition. Lujan and his attorney, William Baker, then appeared at the hearing telephonically, by consent. Assistant United States Attorney Martin McLaughlin appeared in person for respondent the United States of America (the Government). Lujan testified on his own behalf and offered Petitioner's Exhibits 1 through 17, which were admitted. The Government called one witness, Benjamin Gill, and offered Government's Exhibit 1, which was admitted. I then took the petition under advisement and invited both parties to file post-hearing briefs. Because Lujan had filed

a brief in advance of the hearing, the parties agreed that the Government would file the next brief, with Lujan then having the option of filing a reply.

The Government filed its post-hearing brief (Doc. No. 116) on November 12, 2014. Lujan elected not to file a reply. The matter is now fully submitted and ready for decision.

## II. RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

The named defendant in this case, Juan Carlos Hernandez-Morales, was indicted (Doc. No. 2) on July 17, 2013. A superseding indictment (Doc. No. 23) was returned on September 19, 2013, in which Hernandez-Morales was charged with conspiracy to distribute methamphetamine (Count 1), distribution of methamphetamine (Count 2) and conspiracy to commit money laundering (Count 3). On December 30, 2013, he appeared before me and plead guilty to Counts 1 and 3 pursuant to a plea agreement (Doc. No. 46).

In his plea agreement, Hernandez-Morales admitted he was sent to Iowa by Salvador Gomez-Tinajero to collect drug money and deposit it into certain bank accounts. Doc. No 46 at ¶15f-k. He further admitted that he conspired with Gomez-Tinajero to launder the proceeds of Gomez-Tinajero's drug transactions. *Id*. at ¶15e-f. Gomez-Tinajero instructed Hernandez-Morales to pick up money from drug transactions and deposit certain amounts of money, all less than $10,000 to avoid detection, into specific bank accounts for which Gomez-Tinajero had provided account numbers. *Id*. at ¶15f. As it turns out, one of these accounts, a Wells Fargo account with a number ending in 3951 (the Lujan Account), was in Lujan's name. Money was also deposited into at least three other Wells Fargo accounts, including one in the name of Bertha E. Castillo. Government Exhibit 1; Doc. No. 46 at ¶15i.

Judge Bennett accepted Hernandez-Morales's guilty pleas by order (Doc. No. 48) entered December 31, 2013. Hernandez-Morales was later sentenced (Doc. No. 81) to

60 months imprisonment and ordered to forfeit property described in a preliminary order (Doc. No. 52) of forfeiture entered January 10, 2014. That order itemized funds previously seized from three Wells Fargo accounts, including $22,091.75 seized from the Lujan Account, $35,330.09 seized from the Castillo account[1] and $3,069.22 seized from an account in the name of Cecilio Gomez Rios. Doc. No. 52 at ¶ 2.

Lujan received notice of the forfeiture on January 16, 2014. On February 11, 2014, within the period prescribed in 21 U.S.C. § 853(n)(2),[2] Lujan filed his petition (Doc. No. 56) for the return of forfeited property, which included a request for a change of venue.[3] At the Government's request, I established deadlines for depositions and other discovery relating to the petition. Ultimately, after various continuances were granted at the request of the parties, the evidentiary hearing took place on October 15, 2014.

### III. SUMMARY OF EVIDENCE AND (SOME) FINDINGS OF FACT

Lujan testified that he operates an import/export business in California through which, among other things, he assists clients in the export of vehicles and textiles to

---

[1] Castillo also filed a petition (Doc. No. 58) for the return of forfeited property. However, she failed to pursue her claim and her petition was later dismissed. Doc. Nos. 97, 103.

[2] Which states:

> Any person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

21 U.S.C. § 853(n)(2).

[3] After a telephonic conference with counsel on March 14, 2014, I entered an order (Doc. No. 72) establishing a deadline of April 15, 2014, for any motion to change venue. Lujan did not file such a motion.

Mexico. He explained, with the aid of various exhibits, the standard practices that take place during the export process. *See, e.g.,* Petitioner's Exs. 1-3.

Lujan testified that Castillo was a client of his business in 2012 and 2013, and that the business relationship started four or five years earlier. He indicated that her business involved exporting textiles from Los Angeles to Mexico. Lujan's exhibits include documents that, according to Lujan, reflect an export transaction for Castillo in December 2012. Petitioner's Ex. 3. He stated that his business records contain a packet similar to his Exhibit 3 for each such transaction. He testified that he handled approximately fifty shipments for Castillo and charged her a flat fee of $5,000 per shipment. He further testified that she sometimes paid in cash but other times paid by check or by making deposits to his bank accounts in California or Mexico.

Lujan stated that during his business relationship with Castillo, she was married to Gomez-Tinajero – the same Gomez-Tinajero discussed in the Hernandez-Morales plea agreement. Moreover, Lujan testified that Gomez-Tinajero worked with Castillo and often came to his warehouse, sometimes multiple times during a week, to check on the textile shipments. However, Lujan stated that about eighteen months ago Gomez-Tinajero told him he was divorcing Castillo and moving to Guadalajara. Lujan testified that he has not since spoken with Gomez-Tinajero.

With regard to bank accounts, Lujan testified that he maintained a checking account for his business with Wells Fargo in California. He opened a second account, the Lujan Account, with Wells Fargo in April 2013. He stated that he opened the Lujan Account on the advice of a bank teller, who allegedly told him that he had too much money in his checking account and that having all his money in one account was risky. He further testified that he hoped to use the new account for savings. When pressed as to why having only one account at Wells Fargo was risky, or how having a second account could help him save money, Lujan had no good answer.

The first deposit into the Lujan Account occurred on April 29, 2013, when Lujan transferred $20,000 from his checking account to that new account. Petitioner's Ex. 7.

According to Lujan, the $20,000 came from a $27,285 check he received from Express Auto Sales for "referral fees." Petitioner's Ex. 6. Lujan deposited the check into his checking account and then transferred $20,000 of the funds to the Lujan Account. Lujan testified that the referral fees related to his efforts regarding the export of vehicles. Other than the check itself, however, Lujan produced no business records showing that the check from Express Auto Sales represented payment for legitimate business services.

I do not find Lujan's claimed reasons for opening the separate Lujan Account to be credible. Lujan presented no evidence that his existing checking account regularly contained such a large balance that a bank employee would express concern about it being excessive. Indeed, he testified that after transferring $20,000 from the existing account to open the Lujan Account, the remaining balance in the existing account was about $8,000. This was *after* depositing the $27,285 check from Express Auto Sales, meaning the existing account contained $1,000 or less prior to that deposit. Lujan could have presented evidence, such as bank statements from the existing checking account, to show that he regularly maintained such a substantial balance that dividing the funds into two accounts might have made sense. He did not. Instead, and as I will discuss further below, the timing of his decision to open a new account, when combined with other events that occurred soon after, is highly suspicious.

Lujan testified from December 2012 to May 2013, he worked with Castillo to ship four or five truckloads of textiles to Mexico every fifteen days. Despite this large amount of business, the evidence reflects only two payments that Lujan contends were from Castillo. Both are in the form of deposits made to the new Lujan Account: (1) a deposit of $5,000 on May 4, 2013, which credited to the account on May 6, 2013, and (2) a deposit of $4,000 on July 11, 2013, which credited that day. Petitioner's Exs. 8, 11. When asked how Castillo was able to make deposits in the Lujan Account, Lujan stated that she called him prior to the May 4 deposit and asked for his account number so she could pay him by making a deposit into his account. He testified that he decided to give her the number for the new account so he could use her payments as savings. Moreover,

he testified that he was not concerned about the fact that Castillo waited until May to begin making payments for shipments that had started five months earlier. He stated that she is a good customer and always pays, but he sometimes has to wait until she gets paid before she is able to pay him.

Lujan provided two invoices for the work he did with Castillo in connection with the May and July payments, one for $5,000 dated May 8, 2013, and one for $4,000 dated July 11, 2013. Petitioner's Exs. 4, 5. Both invoices are dated after the corresponding deposits were made. Lujan stated that it was his practice to issue invoices to Castillo after she paid him, as it is the issuance of an invoice that triggers tax liability under Mexican law. Thus, he testified that he waited until he confirmed Castillo's deposits before he issued invoices to her. Even though the two had apparently conducted a significant amount of business, he could not remember the last time Castillo had paid him prior to the $5,000 payment on May 4, 2013.

As noted above, Lujan testified that Castillo normally paid him by check, by cash or by deposits to his accounts. However, Lujan failed to provide any documentation of other instances when Castillo – or any other clients – made deposits into any of his accounts. In fact, Lujan admitted the events described above represented the first time he had provided Castillo, or any client, with a bank account number to allow them to make direct deposits to an account in the United States.

I find all of Lujan's testimony concerning Castillo's alleged use of the Lujan Account to be almost comically incredible. Lujan mysteriously opened a second account for reasons that make no sense and then, almost immediately, departed from his past practice by providing the account number to a longtime client who had never before paid him by making deposits to his account – at least in the United States.[4] While Lujan is supposedly a busy businessperson, Castillo happened to be the only client who made

---

[4] While Lujan claims Castillo sometimes paid him by making deposits into his account in Mexico, he provided no documentary evidence. Such evidence should not have been difficult to produce, if Lujan's story were true.

payments to Lujan by making deposits into the Lujan Account. Indeed, Lujan admits that no other client ever made payments to him (again, at least in the United States) by making deposits into any account. These factors, especially when combined with the fact that Castillo was married to the individual who sent Hernandez-Morales to Iowa to collect and deposit drug proceeds, make the two deposits into the Lujan Account highly suspicious. The fact that Lujan did not issue invoices for the charged amounts until after the deposits were made simply adds to the intrigue. I can only conclude that Lujan's story about the two deposits is false.

As if all of this were not enough, Lujan next testified about an $8,000 check he wrote to Castillo, from the Lujan Account, on August 7, 2013. Petitioner's Ex. 12. According to Lujan, this was simply a loan to Castillo. He admitted that there is no documentation of this alleged loan and, indeed, that there are no agreed terms of repayment. He explained that Castillo needed the money to pay bills because her clients had not paid her. He also testified he had never before loaned money to a client or business associate. Lujan presented no evidence that Castillo has ever repaid the alleged loan. Thus, the record reflects that the Lujan Account received two deposits totaling $9,000 and that Lujan then paid $8,000 to Castillo from the same account. I do not believe Lujan's claim that the $8,000 was simply an innocent loan.

The Government's witness, Benjamin Gill, was the case agent for the Hernandez-Morales investigation. Gill testified that when Hernandez-Morales was arrested, officers found Wells Fargo bank receipts in his pockets. One of the receipts was for a $5,000 deposit into the Lujan Account, dated May 4, 2013. Government's Ex. 1. Gill testified that Hernandez-Morales admitted Gomez-Tinajero sent him to Iowa to collect money from drug customers and provided him with information about accounts in which to deposit the collected funds. Once such account was the Lujan Account.

Lujan testified that he does not know Hernandez-Morales and has no idea how he obtained the Lujan Account number or why he deposited money into that account. He stated that he was surprised to discover that drug money was deposited in his account and

that he believed the $5,000 deposit on May 4, 2013, was a legitimate payment from Castillo. He confirmed that he has talked with Castillo about the situation and stated that she claims to have no knowledge as to why Hernandez-Morales deposited funds in their accounts.[5]

I will make additional fact findings, as appropriate, below.

## IV. DISCUSSION

### A. *Applicable Standards*

The illegally obtained property of a criminal defendant is subject to forfeiture. *See* 21 U.S.C. § 853(a); Fed. R. Crim. P. 32.3. While a criminal judgment of conviction that includes a forfeiture order determines property rights as between the government and the criminal defendant, it does not give the government clear title to the forfeited property as against the rest of the world. *United States v. Puig*, 419 F.3d 700, 703 (8th Cir. 2005). An ancillary proceeding governed by Section 853(n) is the only avenue by which a third party may seek to assert an interest in criminally forfeited property. *Id*. A third party may petition the court for a hearing and then has the burden to prove a valid property interest by a preponderance of the evidence. 21 U.S.C. § 853(n)(6). In addition to the evidence presented during the hearing, the court must consider the relevant portions of the record of the criminal case which resulted in the forfeiture. 21 U.S.C. § 853(n)(5).

A petitioner can prove a valid property interest in one of two ways, as described in Section 853(n). *United States v. White*, 675 F.3d 1073, 1081 (8th Cir. 2012). Section 853(n)(6) states:

> If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that –
>
> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest render the order

---

[5] Lujan testified that Cecilio Gomez Rios, the named owner of the third Wells Fargo account from which funds were seized, worked for a trucking company that did business with Castillo.

> of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
>
> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;
>
> the court shall amend the order of forfeiture in accordance with its determination.

21 U.S.C. § 853(n)(6).

A petitioner cannot relitigate the nexus between the criminal acts of the criminal defendant and the forfeited property seized from the bank account in the name of the petitioner. *United States v. Porchay*, 533 F.3d 704, 710 (8th Cir. 2008). Similarly, the petitioner cannot challenge the legality of the property seizure under the Fourth Amendment. *Id.* (citing *United States v. Kiser*, 948 F.2d 418, 424 (8th Cir. 1991) (recognizing that Fourth Amendment rights are personal and cannot be vicariously asserted)); *see also* 21 U.S.C. § 853(k) (stating that the forfeiture statute does not grant third parties the right to intervene in the criminal proceeding except as outlined in Section 853(n)). The purpose of the ancillary proceedings is to determine, as between the petitioner and the Government, who has the greater claim to the forfeited property.

### B. Analysis

Lujan argues that he proved by a preponderance of the evidence that he is entitled to the return of the forfeited funds under subsections (A) and (B) of 21 U.S.C. § 853(n)(6). With regard to subsection (A), he contends that the bulk of the seized funds originated from legitimate business activities, had no connection to the criminal activities

9

of Hernandez-Morales and, therefore, that Lujan's interest in the money arose before the Government's interest. As for subsection (B), Lujan argues that the funds allegedly deposited by Castillo should be returned because Lujan was a bona fide purchaser for value, as those deposits were allegedly payments for legitimate business services he provided.

The Government argues Lujan failed to show he is entitled to the forfeited funds under either subsection. With regard to subsection (A), the Government contends that Lujan did not prove that he had an interest in the funds before the Government's interest vested. The Government argues that once funds involved in criminal activity were deposited into the account, the entire account vested in the Government. The Government further argues that because Lujan failed to show that the other funds in the account (those not deposited by Hernandez-Morales) resulted from legitimate business transactions, Lujan is not entitled to the return of any of the property.

With regard to subsection (B), the Government contends Lujan is not a bona fide purchaser for value because he did not "purchase" the seized funds. Further, the Government alleges Lujan failed to show he had a sufficient legal interest in the funds and failed to show he was without cause to believe the funds were subject to forfeiture. For the reasons set forth below, I conclude with little difficulty that Lujan has failed to show by a preponderance of the evidence that he is entitled to the return of the forfeited property under either subsection (A) or subsection (B).

### 1. *Section 853(n)(6)(A)*

Under subsection (A), the petitioner must demonstrate, by a preponderance of the evidence, priority of ownership of the forfeited property at the time of the offense. *United States v. Timley*, 507 F.3d 1125, 1130 (8th Cir. 2007). That is, the petitioner must show that his or her interest was established in the forfeited property before the Government's interest vested. *Id*. This so-called "priority of ownership ground" embodies the "relation-back doctrine." *Id*. Under the relation-back doctrine, title to the forfeited

property vests in the Government at the time of the defendant's criminal act. *Id.* Therefore, under Section 853(n)(6)(A), only a petitioner who had a legal interest in the forfeited property before the underlying criminal act was committed can prevail in the ancillary proceeding on the ground that he or she had an interest in the property before the Government's interest vested. *Id*. (citing *United States v. Nava*, 404 F.3d 1119, 1129 (9th Cir. 2005)).

Lujan has failed to show by a preponderance of the evidence that he had a legal interest in the forfeited funds before the Government's interest vested. As to the $5,000 deposit made by Hernandez-Morales into the Lujan Account, the Government's interest vested the moment those funds were deposited on May 4, 2013, as that was the time of the criminal act; money laundering. *Timley*, 507 F.3d at 1130. Lujan did not have a legal interest in those funds prior to their being deposited into the account. Instead, and even assuming he believed the deposit was a legitimate business payment by Castillo, Lujan merely had the expectation of receiving payment for his services. He had no interest in the funds that were actually deposited by Hernandez-Morales.

Alternatively, Lujan's claim fails with regard to the $5,000 deposit because that deposit constituted the direct proceeds of criminal activity. As the Eighth Circuit has noted, "a third party can never have a successful claim under Section 853 (n)(6)(A) if the property was the proceeds of an offense." *Timley*, 507 F.3d at 1130. It is clear from the evidence presented by the Government, and from the Hernandez-Morales plea agreement, that the $5,000 deposit Hernandez-Morales made into the Lujan Account was made at a Wells Fargo branch in Iowa as part of his conspiracy to commit money laundering, a criminal offense. *See* 18 U.S.C. § 1956(h). Further, those funds derived from illegal drug transactions and were the direct proceeds of those criminal offenses. Lujan has no right to recover those funds.

As for the $4,000 deposit on July 11, 2013, and the other funds in the seized account, Lujan has not proved by a preponderance of the evidence that he had a legal interest in those funds prior to the time the Government's interest vested. Section

853(n)(6)(A) provides third parties with an avenue to recover forfeited property only if the property was legally theirs prior to being seized. Here, Lujan has failed to show that the other funds seized from the Lujan Account actually belonged to him. As discussed earlier, I find that his explanation for opening that account is false (and, frankly, absurd). Lujan's inability to provide a credible explanation for opening an account that quickly became a repository for criminal proceeds casts doubt on the rest of his testimony. This is especially true in light of his failure to produce evidence concerning the source of the other funds that should be readily available if those funds were legitimate business proceeds.

As noted earlier, Lujan opened the new account by transferring $20,000 from his existing checking account. He testified that this money came from a payment to him by Express Auto Sales in the amount of $27,285 (Petitioner's Ex. 6) for "referral fees." He failed to provide a credible description of such fees, let alone any supporting documentation. He stated that he charges $2 per vehicle for certain documentation relating to the exportation of those vehicles to Mexico and that he sometimes handles over 1000 vehicles per week. He testified that the Express Auto Sales check somehow constituted "referral fees" relating to those services. Lujan failed to explain the precise nature or purpose of those "referral fees." Moreover, other than providing a copy of the check itself, Lujan submitted no documentary evidence supporting his claim that the Express Auto Sales check represented legitimate business proceeds. He did not produce an invoice (or invoices) to Express Auto Sales supporting the amount received. Nor did he provide any itemization of the specific services that led to his receipt of $27,285 from Express Auto Sales. At minimum, if payments of this magnitude occurred in the ordinary course of his business he could have provided bank statements from his established checking account showing those regular deposits.

Lujan provided nothing of the sort.[6]  Instead, the record contains only the check itself and Lujan's general explanation as to why he received it.  I find that explanation to be false.  As already discussed, his explanation for opening the Lujan Account is not credible and other factors likewise demolish his credibility.  For starters, of course, his longtime client, Castillo, happened to be married to Gomez-Tinajero, a drug trafficker who not only sent Hernandez-Morales to Iowa to collect and deposit drug proceeds, but also regularly visited Lujan's warehouse to "check in."

Next, Lujan's explanation for providing Castillo with the Lujan Account number is suspicious, to be kind.  He claims that she asked for an account number to allow her to make direct payments to him and that he decided to provide her with the Lujan Account information instead of the account number for his regular checking account.  Although he had done business with Castillo for years, Lujan admits this was the first time he had given her a bank account number for direct deposit payments in the United States.  And while he claims to have conducted business with Castillo in this manner in Mexico, Lujan provided no documentary evidence supporting this claim.  Nor did he produce evidence that he ever provided account information to any other client to allow deposits to be made into any account.  Nonetheless, Lujan gave Castillo the Lujan Account information and claims she verified that both the $5,000 deposit in May and the $4,000 deposit in July were her payments to Lujan.  Only then did he prepare invoices for each alleged transaction. Petitioner's Exs. 4, 5.  In fact, of course, Hernandez-Morales deposited $5,000 of drug proceeds into the Lujan Account shortly after Lujan gave Castillo the account information.

---

[6] Lujan's Exhibit 1 was described as being representative of the various documents that must be created to export a vehicle to Mexico.  All eight pages of that exhibit relate to a single vehicle, a 2008 Hyundai Sonata with VIN 5NPET46C58H374513.  Petitioner's Ex. 1.  Nothing about Exhibit 1 supports Lujan's claim that he legitimately earned a $27,285 payment from Express Auto Sales.

To top it off, after receiving $9,000 in deposits that he allegedly believed to be legitimate business payments from Castillo, Lujan generously returned $8,000 of those funds to her in the form of a "loan" with no terms, no paper and, as it turns out, no repayment. One need not be overly cynical to piece those events together into something that looks remarkably like a money laundering scheme.

For all of these reasons, I find no reason to believe any of Lujan's testimony. As such, his ability to prove that he had a legitimate, pre-existing interest in any of the seized funds depends entirely on documentary evidence. As I have explained, however, that evidence falls short as well. Legitimate business proceeds should be easy to document. However, Lujan failed to produce such documentation with regard to any of the funds in the Lujan Account. While providing evidence that he apparently engages in a legitimate business, he failed to show that funds deposited into the Lujan Account were the proceeds of that business. Lujan has failed to establish by a preponderance of the evidence that he had an interest in the forfeited property before the Government's interest vested. As such, I recommend that his request to have that property returned to him pursuant to 21 U.S.C. § 853(n)(6)(A) be denied.

### 2. *Section 853(n)(6)(B)*

Subsection (B) provides that a person who acquired an interest in the forfeited property after the government's interest vested may prevail if he or she was a bona fide purchaser for value. *Timley*, 507 F.3d at 1130. A petitioner must prove three elements to prevail under this subsection: 1) he or she has a legal interest in the forfeited property; 2) the interest was acquired as a bona fide purchaser for value; and 3) the interest was acquired at a time when the petitioner was reasonably without cause to believe that the property was subject to forfeiture. *White*, 675 F.3d at 1081 (quoting *Timley*, 507 F.3d at 1130-1131).

Taking the second element first, Lujan claims he established that element by showing that he received payments to the Lujan Account for services rendered. The

Eighth Circuit Court of Appeals has not decided whether the receipt of cash for services qualifies as a purchase within the meaning of the second element. It is not necessary to decide that issue here. Even if Lujan was a bona fide purchaser for value, his claim fails because he did not prove the first or third elements.

As discussed above, Lujan failed to prove he had a legal interest in the funds on deposit in the Lujan Account. While claiming that those funds were business proceeds, his testimony is not credible and he failed to produce records that should be readily available to document legitimate business transactions. Lujan has not established the first element of his subsection (B) claim.

As for the third element, Lujan has not shown that he had no cause to believe the property would be subject to forfeiture. Lujan testified he had no knowledge of Gomez-Tinajero's drug trafficking and money laundering endeavors, or that cash proceeds from those endeavors was deposited into his account. However, as detailed earlier, the record depicts the opposite. Lujan dealt with Gomez-Tinajero closely throughout his business relationship with Castillo, as Gomez-Tinajero often visited Lujan's warehouse – supposedly to verify and double check Castillo's textile shipments. After six months of allegedly-significant business with Castillo and Gomez-Tinajero, Lujan provided no evidence of billing them or receiving payment for his services in the ordinary course of business. Instead, Lujan opened a new bank account for reasons that are not credible and, shortly thereafter, started receiving deposits into that account that supposedly constituted payments from Castillo. After receiving $9,000 of such deposits, Lujan "loaned" $8,000 from the Lujan Account back to Castillo.

Based on the record that has been established, I find that Lujan was well-aware that the Lujan Account was created to facilitate criminal activity. While he may not have had precise knowledge of Gomez-Tinajero's exact activities, the circumstances described above are suspicious enough that Lujan could not have reasonably believed that the Lujan Account contained legitimate business proceeds. Lujan has not established the third element of his subsection (B) claim.

Because Lujan has failed to prove his claim by a preponderance of the evidence, I recommend that his petition for the return of forfeited property pursuant to 21 U.S.C. § 853(n)(6)(B) be denied.

## V. CONCLUSION

For the reasons set forth herein, I RESPECTFULLY RECOMMEND that Rafael E. Chavez Lujan's petition (Doc. No. 56) for return of money be **denied**.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 16th day of December, 2014.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE